**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Cr. No. 06-033 (PLF) |
| v.                         ) | |
| ) | |
| ROBERT LEE JACKSON        ) | |
| _____ ) _____ | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Mr. Robert Lee Jackson, through his counsel, Rita Bosworth, Assistant Federal Public

Defender, hereby respectfully submits this memorandum in aid of sentencing, pursuant to Federal

Rule of Criminal Procedure 32.  Based on all the sentencing factors in this case, including the

United States Sentencing Guidelines, Mr. Jackson respectfully submits that he should be

sentenced to a period of incarceration of five years.

**BACKGROUND**

On February 7, 2006, a five-count indictment was filed against Mr. Jackson. The criminal

conduct charged in the indictment occurred between October 29, 2005, and November 13, 2005.

Mr. Jackson was arraigned on February 23, 2006, and released on personal recognizance with

conditions to report weekly to pretrial services and to report for drug testing.  Because Mr.

Jackson is admittedly addicted to drugs, he tested positive for cocaine at his initial drug test.  On

March 8, 2006, the Court continued Mr. Jackson on personal recognizance but directed that he

enroll in the New Directions drug treatment program.  There unfortunately was not enough space

1

for Mr. Jackson in this program, so rather than enter a program that he would be unable to complete before his plea, Mr. Jackson requested that the Court move up his plea date. Mr. Jackson was otherwise in perfect compliance with his conditions, and he never failed to appear for court.

On March 24, 2006, Mr. Jackson entered a plea of guilty to Counts Three and Five of the indictment pursuant to the provisions of a written plea agreement. Mr. Jackson was taken into custody at this point due to a provision of the plea. Presently, Mr. Jackson is scheduled to be sentenced on June 5, 2006.

## DISCUSSION

### I.   THE POST-<u>BOOKER</u> SENTENCING FRAMEWORK.

Under Justice Breyer's majority opinion in <u>Booker</u>, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. <u>See</u> 18 U.S.C. § 3553(a)(4)." <u>United States v. Booker</u>, 543 U.S. 220, 264 (2005) (Breyer, J.). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the remedial majority in <u>Booker</u> held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Pursuant to <u>Booker</u>, therefore, courts must treat the Guidelines as but one, among several, sentencing factors.

Pursuant to 18 U.S.C. §§ 3562 and 3553(a)–which were explicitly endorsed by the Supreme Court in <u>Booker</u>–sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

2

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

Pursuant to 18 U.S.C. § 3661, also expressly endorsed by the Booker majority:

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

Section 3582 of Title 18 states that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Taken together, the directives of Booker, as well as Sections 3553, 3661, and 3582 of Title 18, make it clear that sentencing courts may no longer consider the Guidelines alone in determining the appropriate sentence. With respect to *departures* from the Guideline range, in particular, following Booker courts need not justify sentences outside the Guidelines by citing

3

factors that take the case outside the "heartland."  Rather, as long as the sentence imposed is

reasonable and supported by the factors outlined in Section 3553, courts may disagree with the

range proposed by the Guidelines in individual cases and exercise their discretion.


**II.     UNDER ALL OF THE RELEVANT SENTENCING FACTORS, MR. JACKSON
         SHOULD RECEIVE A SENTENCE OF INCARCERATION OF FIVE YEARS**

         A.     Statutory Provisions

         Pursuant to the applicable statutes for Count 3, the minimum term of imprisonment is

five years, while the maximum term of imprisonment is forty years for this Class B felony. 21

U.S.C. §§ 841(a)(1) and (b)(a)(B)(iii).

         Pursuant to the applicable statutes for Count 5, the maximum term of imprisonment is ten

years for this Class C felony.  18 U.S.C. §§ 922(g)(1) and 924(a)(2).


         B.     Advisory Sentencing Guidelines

         *(I).    Applicable Guideline Range*

         The Probation Office, consulting the 2005 edition of the Guidelines Manual in

conjunction with the March 27, 2006, supplement, has concluded that the Adjusted Offense

Level in this case is 31 and that Mr. Jackson's criminal history category is III, resulting in an

advisory Guideline range of 135-168 months.

(II).    *Mr. Jackson Should Receive a Downward Departure to Account for the Crack-Cocaine Disparity.*

The Court should reduce Mr. Jackson's sentence to account for the 100:1 crack/powder disparity built into the offense level for offenses involving crack cocaine.[1]  As set forth below, the dramatic disparity between sentences for powder and crack cocaine is unwarranted.  If that disparity is reduced to 20:1--as advocated by the Sentencing Commission itself--Mr. Jackson's offense level would be a 28.  <u>See</u> U.S.S.G. § 2D1.1(c)(7).[2]  After reducing that offense level by 3 levels to  account for acceptance of responsibility, Mr. Jackson's appropriate guideline range is **70-87 months.** The argument against imposing a sentence that incorporates the 100:1 crack/powder disparity is based primarily upon the Sentencing Commission's own disavowal of the basis for that disparity.  The Commission has issued several reports discounting the disparity.

_____

[1] Should this Court determine that the crack-cocaine disparity is not a permissible basis on which to "depart" from Mr. Jackson's Guideline's range, Mr. Jackson nevertheless asks the Court to consider the effects of the crack-cocaine disparity as an additional sentencing-relevant factor pursuant to the purposes set forth in 18 U.S.C. § 3553(a).

[2] This offense level is arrived at by converting all the drugs in this case to marijuana, assuming that 1 g cocaine base = 4 kg marijuana:

49 g cocaine base = 196 kg marijuana
10.8g heroin = 10.8 kg marijuana
11.7 g heroin = 11.7 kg marijuana
_____

218.5 kg marijuana

Base offense level for 100 kg to 400 kg of Marijuana = 26
Gun bump        +2
_____
Total BOL        28

<u>See</u> U.S.S.G. § 2D1.1(c)(7).

1. **The 1995 Report**

In February 1995, the Commission issued the first report, <u>Special Report to the Congress:</u> <u>Cocaine and Federal Sentencing Policy</u> (Feb. 1995) ("1995 Report"). The Report repudiated the still-existing crack sentencing structure.

The 1995 Report is a comprehensive study which analyzes and considers the appropriate level of punishment to be imposed for crack offenses by the very agency charged by Congress to make sentencing determinations and recommendations. <u>See</u> 28 U.S.C. § 994. The report analyzes each factor perceived to be relevant to the distinction between crack and powder cocaine. Many of the factors were found to provide no support for a higher penalty for crack. Of "[t]he factors that suggest a difference between the two forms of cocaine," however, the Report concludes that they "do not approach the level of a 100-to-1 quantity ratio." 1995 Report at xiv.

Analyzing information not considered at the time the existing ratio was adopted, the Commission found that the 100-to-1 penalty ratio (i) cannot be justified by the physiological effects of the two forms of cocaine, 1995 Report at 182-83; (ii) has a disparate impact on blacks (in the last fiscal year for which data was available, 88.3% of crack defendants were black, 7.1% were Hispanic, and only 4.1% were white), Crack Report at 161, Table 13; (iii) creates higher penalties for street dealers than for their more culpable supplier, Crack Report at 174; (iv) effects a double punishment on crack defendants in light of subsequent guideline changes, 1995 Report at xv; and (v) creates extraordinary disparities given the street values of the two forms of cocaine.[3] 1995 Report at 173, Table 19.

_____

[3] For example, at offense level 18, the street value of cocaine base was $115. The street value of powder cocaine at the same offense level was $10,700. 1995 Report at 173, Table 19.

The 1995 Report concludes that the 100:1 ratio should be eliminated and replaced with specific sentence enhancements more closely tailored to the supportable harm associated with some crack cocaine offenses.  The Report states:

> The Sentencing Commission shares congressional and public concern about the harms associated with crack cocaine - - both to users and to the society as a whole - - including the violence associated with its distribution, its use by juveniles, the involvement of women and juveniles in its distribution, and its addictive potential.  However, the Sentencing Commission concludes that Congress's objectives with regard to punishing crack cocaine trafficking can be achieved more effectively without relying on the current federal sentencing scheme for crack cocaine offenses that includes the 100-to-1 quantity ratio.

1995 Report at xiv.

By subsequently promulgating proposed amendments to the crack guidelines, the Commission acknowledged that it had not adequately considered factors bearing on the 100:1 sentencing disparity between crack and powder cocaine before enacting the guidelines presently in effect and in light of changes to other guidelines specifically addressing harms associated with some crack offenses.  In short, "the Commission concluded that sufficient policy bases for the current penalty differential do not exist."

With respect to the crack cocaine guidelines, the 1995 Report demonstrated that the Commission by its own admission overlooked a number of factors which are relevant to the statutorily-defined sentencing purposes.  The Commission acknowledged this in the 1995 Report and in its submission to Congress of a guidelines amendment proposing the equalization of the crack/powder cocaine penalties.  60. Fed. Reg. 25, 074 (May 10, 1995).  The Commission admitted that its guidelines for crack cocaine offenses fail to consider "characteristics of the offense and the offender" other than "the quantity and form of cocaine."  1995 Report at I.  "In a

given case," other characteristics "can be equally or more important" to the determination of the "appropriate punishment."  Id.

Among the factors that the Commission stated that it had not adequately considered are: (1) the geographic range of a defendant's illegal activity; (2) the profit to be reaped by a defendant; (3) a defendant's role as a retail street dealer rather than a wholesale distributor; (4) the lack of violence associated with the offense; (5) the absence of a weapon; (6) the flattening and inversion of penalties vis a vis cocaine suppliers; (7) the absence of juveniles in the offense; and (8) the lack of psychopharmacologically induced crime.  1995 Report at 168-175; 193-197. Some of these factors were not adequately considered because they are subsumed in the current ratio although they may not be present in most cases or in a given case; other factors, when present in a case, are being doubly punished because of separate enhancements for the factor.  Id. at 193-197.

The 1995 Report had also noted that there was some evidence suggesting that more violence was associated with trafficking and use of crack cocaine than with powder cocaine but that the evidence did not suggest that the increased level of violence "justifies a ratio as large as 100-to-1."  1995 Report at 197.  Indeed, the data demonstrated that the form of cocaine involved in an offense is not as accurate an index of a defendant's dangerousness or propensity for violence as are the guideline enhancements expressly designed by the Commission to capture such characteristics.  Id. at 166.  Significantly, separate guideline enhancements did not exist when Congress first enacted mandatory minimums in 1986.  "[T]o the extent that the guidelines now provide a punishment for some of those same factors subsumed in the ratio, those factors generate an enhancement both through an increased ratio differential and through guideline

8

adjustments.  In short, [crack cocaine defendants] are doubly punished through the interplay of

the two structures."  Id. at 196.  The Commission concluded that the use of enhancements based

on injury to victims, violence, possession of a weapon, and the like is a "distinctly fairer"

approach than a penalty scheme that "relies exclusively or primarily on a quantity ratio to

distinguish among offenders warranting greater punishment . . . ."  Id. at 199.  The Commission

acknowledged that the crack guidelines do not promote 'fairness' or 'just punishment' "because

they punish less culpable crack dealers more severely than more culpable cocaine dealers and

suppliers" and that "no policy basis for the present 100:1 sentencing differential exists".

As discussed above, the Commission, shortly after issuing the 1995 report, proposed a

guideline that would have equalized the amounts of crack and powder under the guidelines.

Congress voted to disapprove this amendment, but directed the Commission to further study the

matter.

### 2.    The 1997 Report

In April 1997, the Commission issued its second report, Special Report to the Congress:

Cocaine and Federal Sentencing Policy (April 1997) ("1997 Report").  This 1997 Report also

concluded that the crack/powder sentencing disparity was unwarranted.

In the 1997 Report the Commission carefully considered each factor listed in the

congressional directive and evaluated current federal cocaine sentencing policy in relation to

congressional goals for drug offense sentencing.  The goals suggested that those who traffic in

either powder or crack cocaine should be sentenced severely but that the current penalty

differential between powder and crack cocaine sentencing must be reduced.  See 1997 Cocaine

Report at 3.  The Commission concluded that the five-gram trigger for crack cocaine is "over

inclusive" because it is indicative of a retail or street-level dealer rather than a mid-level or serious drug trafficker.  Id. at 5.  It further noted that if a street-level seller possessed a gun or engaged in violence in connection with such a sale, a sufficiently severe sentence could be imposed by virtue of specific guideline enhancements; but the five-year mandatory minimum penalty should not be triggered by such a small quantity.  See id.  at 506.  The Commission also found that by 1997 nearly 90 percent of those convicted in federal courts for crack cocaine distribution were African Americans, while the majority of crack cocaine users were White.  See id. at 8.  As a result, the sentences are "harsher and more severe for racial minorities than others," and the current penalty structure "results in a perception of unfairness and inconsistency."  Id.

After reviewing all the data related to the stated congressional goals for federal drug policy, the Commission again concluded that Congress' objectives can be "achieved more effectively without relying on the current federal sentencing scheme for cocaine offenses that includes the 100-to-1 quantity ratio."  1997 Cocaine Report at 9.  It unanimously reiterated its original core finding that, although research and public policy may support somewhat higher penalties for crack cocaine than for powder cocaine, a 100-to-1 quantity ratio simply "cannot be justified."  Id. at 2.  In coming to this conclusion, the Commission balanced the conflicting goals of congressional and public concern about the harms associated with both forms of cocaine - including the potential violence associated with its distribution in some cases, its use by juveniles, the involvement of juveniles in its distribution, and it addictive potential.  See id. at 9.  The Commission again recommended that Congress revise the federal statutory scheme for crack and powder cocaine offenses because hundreds of people continue to be sentenced under an unfair law.  See id. at 8-9.

10

3.    **The 2002 Commission Report**

The Sentencing Commission recently issued a new Report to the Congress: Cocaine and Federal Sentencing Policy (May 2002) ("2002 Report").  In it, the "Commission again unanimously and firmly concludes that the various Congressional objectives can be achieved more effectively by decreasing substantially the 100-to-1 drug quantity ratio." Id. at viii.  In reaching this conclusion, the Commission debunked a number of myths upon which the original disparity was apparently based.  The Commission made four main findings.  First, it found the current penalties exaggerate the relative harmfulness of crack cocaine.  Second, the current penalties sweep too broadly and apply most often to lower level offenders.  Third, the current quantity-based drug sentencing system overstates the seriousness of most crack offenses and fails to provide adequate proportionality.  Fourth, the Commission concluded that the severity of the current penalties mostly impacts minorities.  Id. at v-viii.  The Commission proposed a model guideline amendment to remedy the problems with extensive modifications.  Id. at A-1 to A-10.

With respect to race, the Commission stated:

> The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000 (*see* Chapters 5 and 8).  This has contributed to a widely held perception that the current penalty structure promotes unwarranted disparity based on race.  Although this assertion cannot be scientifically evaluated, the Commission finds even the perception of racial disparity problematic because it fosters disrespect for and lack of confidence in the criminal justice system.  Moreover, to the extent that the 100-to-1 drug quantity ratio is shown to result in unduly severe penalties for most crack cocaine offenders, the impact of the severity falls primarily upon black offenders.

Id. at viii.  The Commission further stated:

> One of the key issues surrounding the debate concerning the different penalty structures for crack cocaine offenses and powder cocaine offenses

11

relates to the racial composition of federal crack cocaine offenders.  The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000.  This has contributed to a widely-held perception that the current penalty structure for federal cocaine offenses promotes unwarranted disparity based on race.

In order to evaluate whether the crack cocaine penalties disproportionately impact blacks, data regarding the racial composition of the entire population of crack cocaine traffickers would be required.  For example, if 85 percent of federally convicted and sentenced crack cocaine traffickers are black, the fact that the same percentage of all crack cocaine traffickers are black would tend to undermine the assertion of unwarranted disparity based on race.  On the other hand, if 85 percent of federally convicted and sentenced crack cocaine traffickers are black, the fact that some lower percentage of all crack cocaine traffickers are black would tend to support the assertion of unwarranted disparity based on race.  Although data regarding the racial composition of crack cocaine users are available, such data do not exist for crack cocaine traffickers generally.  As a result, this assertion cannot be evaluated scientifically.

Nevertheless, the Commission finds even the perception of racial disparity to be problematic.  Perceived improper racial disparity fosters disrespect for and lack of confidence in the criminal justice system among those very groups that Congress intended would benefit from the heightened penalties for crack cocaine.

\* \* \*

The fact that those same communities and many of their representatives now seek change in the federal cocaine penalty structure suggests a critical re-examination of the current penalty structure may be warranted.

Furthermore, to the extent that the preceding analysis has shown that the 100-to-1 drug quantity ratio results in unduly severe penalties for most crack cocaine offenders, the effects of the severity fall primarily upon black offenders.

Id. at 102-103.

### 4.    The 2004 Assessment

Even more recently, in its report, Fifteen Years of Guidelines Sentencing: An Assessment

of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform

(November 2004), the Commission again criticized the harsher penalties for crack.  The

Assessment again noted the stark racial impact of this disparity:

> In 2002, 81 percent of the offenders sentenced for trafficking the crack form of cocaine were African-American.  The average length of imprisonment of crack cocaine was 119 months, compared to 78 months for the powder form of the drug.  Average sentences for crack cocaine were 25 months longer than for methamphetamine and 81 months longer than for heroin.

Id. at 131 (footnotes omitted).

The Assessment further noted that:

> The Commission has previously reported that the harms associated with crack cocaine do not justify its substantially harsher treatment compared to powder cocaine.
>                          . . .
> For these and other reasons, the Commission has repeatedly recommended that the quantity thresholds for crack cocaine be revised upward.  In 2001 (USSC, 2001) the Commission recommended that the crack threshold be raised to at least 25 grams from 5 grams, replacing the current 100-to-1 ratio with a 20-to-1 ratio.

Id. at 132.  The Assessment concluded that:

> As shown in Figure 4.10, this one change to current sentencing law would reduce the gap in average prison sentences between Black and White offenders by 9.2 months.  Among drug trafficking offenders only, the current gap is even wider -- 92.1 months for Blacks compared to 57.9 months for Whites -- and the reduction would be even greater, 17.8 months.  This one sentencing rule contributes more to the differences in average sentences between African-American and White offenders than any possible effect of discrimination.  Revising the crack cocaine thresholds would better reduce the gap than any other single policy change, and it would dramatically improve the fairness of the federal sentencing system.

Id. (emphasis added).


**5.      Cases**

13

The D.C. Circuit rejected the argument that a downward departure under the then-mandatory Guidelines was permissible because of the unwarranted crack/powder sentencing disparity.  See United States v. Anderson, 82 F.3d 436 (D.C. Cir. 1996).  In Anderson, the defendant relied heavily upon the 1995 report to argue that such a departure was warranted.  The court in Anderson, however, relied primarily upon the fact that the 1995 Report was not assigned official status under 18 U.S.C. § 3553(b), and thus the 1995 Report had essentially no bearing in departure analysis under the mandatory guidelines system.  Id. at 440-41.

Notably, however, the majority in Anderson declined to address an argument that the disparity violated the requirements of § 3553(a), claiming the defendant had not raised the issue.  Id. at 441.  The court noted that § 3553(a) had to be read in light of the express requirements of § 3553(b).  Id.

In dissent in Anderson, Judge Wald focused on § 3553(a):

> The majority's analysis is flawed because it stops short of asking the critical question: whether these cases fit into that very narrow category of circumstances where a policy statement or official commentary is not binding upon a sentencing court because it violates constitutional or statutory dictates.  In light of the findings in the Special Report, it seems to me that applying the atypicality requirement to deny departure authority would violate a federal statute - - the Sentencing Reform Act itself.  Section 3553(a) of the Sentencing Reform Act sets forth the factors a court must consider when sentencing under the guidelines, directing courts to impose a sentence which is "sufficient, but not greater than necessary" to achieve the goals of sentencing. In usual cases, it is reasonably assumed that the Commission's guidelines adequately reflect these purposes.  But that assumption falls apart in the exceptional situation where the Commission itself admits that its guidelines do not accomplish the four purposes of § 3553(a).  To blindly adhere to the atypicality requirement even if doing so would plainly violate the mandates of § 3553(a) is to give no meaning at all to that provision - - an interpretation which would be at odds with basic tenets of statutory construction.
>                                                    . . .

14

> The nub of the problem here, of course, is that the *Special Report* is a
> startlingly forthright admission by the Sentencing Commission that its
> crack guidelines violate § 3553(a)'s instructions that a court impose a
> sentence "sufficient, but not greater than necessary" to "reflect the
> seriousness of the offenses" and "provide just punishment."
>
> . . .
>
> The[ ] acknowledgments by the Commission itself - - that crack sentences
> raise "[i]ssues of 'fairness' or 'just punishment'" because they punish less
> culpable crack dealers far more severely than more culpable cocaine
> dealers and suppliers, and that no policy basis for the present 100:1
> sentencing differential exists - - make it impossible to square the crack
> guidelines with the sentencing purposes of § 3553(a). For this reason, I
> believe a district court is authorized to disregard the atypicality
> requirement and, though it should proceed cautiously in this largely
> unchartered terrain, to grant a departure if it determines that application of
> the crack guidelines to the case it before it will, in fact, plainly violate §
> 3553.

Id. at 446-48 (Wald, J., dissenting).

In In re Sealed Case, 292 F.3d 913 (D.C. Cir. 2002), the defendant argued that the

Supreme Court's decision in Koon v. United States, 518 U.S. 81 (1996), had overruled

Anderson. The court, however, continued to adhere to the heartland analysis of § 3553(b), and

relying upon Anderson, reaffirmed its decision that a departure for the crack/powder disparity

could be imposed.

The decision in Booker has eviscerated the rationale for the holdings in Anderson and In

re Sealed Case. The Supreme Court in Booker excised § 3553(b)(1), the provision upon which

the majority in Anderson relied for its decision, and made the Guidelines advisory and a factor to

be considered along with all the other factors set forth in § 3553(a). Thus, Judge Wald's dissent

in Anderson now directly addresses the issue before this court. She cogently points out how the

unwarranted crack/powder disparity violates § 3553(a)'s provisions.

Moreover, the current basis for the disparate treatment of crack and powder sentences,

15

unfortunately, was permeated with racial considerations, reflected in Congress's disapproval in 1995 of the Commission's amendment that would have equalized the treatment of the two substances. The rejected amendment would have abolished the 100:1 ratio between crack and powder while creating or enhancing adjustments for violence and the use of minors in connection with drug trafficking offenses.

The members of Congress who voted to reject the equalization of the cocaine penalties repeatedly and unanimously explained their position in terms of their desire to protect African-Americans and other minorities living in inner city neighborhoods from the harm caused by the use and distribution of crack cocaine. The record of the Congressional debate of October 18, 1995, in which the House adopted the bill rejecting the equalization amendment that had already been adopted by the Senate, prominently reflects this motivation. See 104 Cong. Rec. H10256-10283 (daily ed. Oct. 18, 1995).

### 6.    The Smith Case

Consistent with Booker and the above discussion, a district court very recently imposed a sentence below the recommended guidelines because of the unwarranted disparity between crack and powder. In United States v. Smith, 2005 WL 549057 (E.D. Wis. March 3, 2005), Judge Lynn Adelman of the Eastern District of Wisconsin dealt with a defendant facing a ten-year mandatory minimum sentence, whose Guidelines range was 121-151 months, as a result of an offense level of 31 and a criminal history category of II. The government, however, moved for a 6-level departure under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). This would have resulted in a Guidelines range of 70-87 months, but, because the § 3553(e) motion did away with the

16

mandatory minimum sentence, the "extent of any departure granted is within the court's

discretion." Initially, Judge Adelman granted a 10-level departure for the substantial assistance.

Judge Adelman then thoroughly reviewed the Commissions's three reports, as well as

other literature on the crack/powder disparity. She noted that the "Commission has studied the

issue in depth and concluded that the assumptions underlying the disparity between crack and

powder are unsupported by data." She concluded, as had the Commission, that "none of the

previously offered reasons for the 100:1 ratio withstand scrutiny." She reviewed the

Commission's efforts to eliminate the unwarranted disparity:

> In the present case, I concluded that adherence to the guidelines would
> result in a sentence greater than necessary and would also create
> unwarranted disparity between defendants convicted of possessing powder
> cocaine and defendants convicted of possessing crack cocaine. The
> question then became what ratio to apply. Everyone seems to agree that
> 100:1 is too high.

In <u>Smith</u>, the drugs were found in defendant's home. There were 69.99 grams of crack

and 653.19 grams of powder. The district court converted this to 1528 kilograms of marijuana,

in accordance with the drug equivalency table in § 2D1.1 comment. (n.10). The crack converted

to 1399.80 kilograms of marijuana, and the powder to 130.63 kilograms. Thus, the powder,

which was almost ten times the quantity of crack, had no affect on the offense level. The

resulting offense level was 32. There were also two loaded handguns in a dresser, which

increased the offense level by 2 under § 2D1.1(b)(1). With a three-level decrease for acceptance

of responsibility, the adjusted offense level was 31.

The defendant in <u>Smith</u> also had two prior convictions, both for possessing marijuana.

He received "short jail terms" for the prior convictions. This put him in criminal history category

17

II.  The resulting Guidelines range was 121-151 months.  Judge Adelman, however, ultimately decided to apply the roughly 20:1 ratio that would have resulted from the 2002 Report's recommendations and proposed Guidelines restructuring.  This resulted in a Guidelines range of 27-33 months.  Under all the circumstances, she imposed a sentence of 18 months.

For the same reasons set forth in Smith, the Court should apply the 20:1 ratio and reduce Mr. Jackson's Guideline range accordingly in this case. As noted above, the resulting applicable Guideline range is 70-87 months.

(III).    *Mr. Jackson Should Receive a Downward Departure Based on his critical physical condition and deteriorating health.*

The Court should grant Mr. Jackson a downward departure, pursuant to USSG § 5H1.4, from his advisory Guideline range of 70-87 months in light of his multiple physical ailments and deteriorating health.

Mr. Jackson is 54 years old.  He suffers from a plethora of sicknesses, each of which is quite serious, the combination of which are deadly.  Mr. Jackson has been HIV positive since 1993.  He also has Glaucoma, Hepatitis C, and Hypertension.  Since he has been at the D.C. Jail, he has been diagnosed with diabetes.  The following is a list of medication Mr. Jackson must receive *every day* or else cause severed damage to his already precarious health:

        Clonadine, 2x/day, once in the a.m., once in the p.m.
        Viruset, 2x/day, once in the a.m., once in the p.m.
        Multivitamin, 1x/day
        Bactrum, 1x/day
        Truvada, 1x/day
        Videx, 1x/day
        Injection for Hepatitis every other month

Since Mr. Jackson has been in jail, attention to his medical needs has been inconsistent, and last time counsel spoke with him, he was not receiving all the above mentioned necessary medication. His physical condition is extremely fragile, and his ailments have progressed to a point where lack of attention and care could severely risk his health, and perhaps his life. For this reason, Mr. Jackson's case is extraordinary, and he is entitled to a downward departure under the advisory guidelines.

### C. Other Factors

As noted above, pursuant to 18 U.S.C. §§ 3562 and 3553(a) sentencing courts should consider the need for the sentence imposed 1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; 2) to afford adequate deterrence to criminal conduct; 3) to protect the public from further crimes of the defendant; and 4) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged. Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above.

*I. Nature of the Offense*

While Mr. Jackson in no way wishes to diminish the seriousness of the offense, he notes

19

that nobody was harmed during the commission of these offenses. He does, however, understand the impact drug use has on the community, and he regrets it. Mr. Jackson accepts full responsibility for his behavior, but he harbored no malice or ill-will in committing the offenses.

As far as the drug offense is concerned, counsel wishes to incorporate the arguments set forth above, in Section II (B) *(II)*, relating to the sentencing disparity between crack and cocaine.

*II. Characteristics of the Defendant*

As outlined in the PSR, Mr. Jackson grew up without the benefit of a relationship with his father, who died shortly after Mr. Jackson was born. Due in part to his lack of paternal support at home, Mr. Jackson began using drugs at the age of 17. His drug use became more entrenched, and despite his efforts to free himself from the grips of addiction, Mr. Jackson has been unable to remain clean. Again, he does not purport to be making excuses for himself, but he would like the Court to understand that he grew up with little means and limited family support, and he became a product of his environment.

That being said, Mr. Jackson does have some positives in his life. His girlfriend, Michelle Harper, is a supportive and caring woman who has stood by Mr. Jackson and helped him in his desire to clean up. She remains loyal to him even now that he is facing at least five years in prison. Mr. Jackson has demonstrated that he is an intelligent and motivated individual, for though he dropped out of high school, he completed his GED and has been able to maintain employment when his health permits. Counsel spoke with Andre Pope, Mr. Jackson's supervisor when he worked at Safe Haven, who had nothing but nice things to say about Mr. Jackson's worth ethic and demeanor. Clearly Mr. Jackson has a good heart and strong character.

*III. Needs of the Community and Public*

Mr. Jackson understands that the community suffers when drugs are present, and he regrets that very much.  He wishes he was not a drug addict, and he wishes he had been given more opportunities to succeed in his life.  He understands that there is a statutory mandatory minimum of five years for his offense, and he accepts responsibility for that.  But he has shown that he can be a contributing member of society by working and supporting his family.  He has shown that he does not have any ill will or desire to harm anyone.  He has shown that he wants to help himself by getting drug treatment and breaking free of his addictions.  Five years will be more than a sufficient amount of time for Mr. Jackson to get over his drug addiction and for the public to be satisfied that he is being adequately punished for his wrongdoings.  Imposition of any term of imprisonment beyond the mandatory five years would be unduly punitive.  Not only would it most certainly jeopardize his health, but it would prove more detrimental to his character than rehabilitative or instructive, and nobody, not the community, the public, nor Mr. Jackson, would benefit from that.


## **CONCLUSION**

_____For the reasons set forth above, as well as for any others that it may deem fair and reasonable, Mr. Jackson asks the Court to sentence him to a period of incarceration of five years.  Such a sentence would be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553.

As far as the advisory Sentencing Guidelines are concerned, in light of Mr. Jackson's

failing health, his case clearly falls outside the mythical "heartland." Furthermore, the effects of

the crack-cocaine disparity warrant consideration and an additional downward departure.

Respectfully submitted,

A.J. Kramer
Federal Public Defender


_____/s/_____
Rita Bosworth
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C.  20004
(202) 208-7500 ex.105